# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 16, 2011 Session

## ANTHONY RAY ADKINS ET AL. v. BLUEGRASS ESTATES, INC. ET AL.

**Appeal from the Chancery Court for Claiborne County**
**No. 16,335      Billy Joe White, Chancellor**

---

**No. E2011-00044-COA-R3-CV-FILED-AUGUST 30, 2011**

---

The purchasers of lots in a "subdivision known as Timberlake Estates, Phase One" – described in a plat and restrictive covenants as a twenty-lot subdivision – acquired with their deeds the right to use a boat ramp and parking area to be located in a common area within the subdivision. When they learned that additional lots – not located within the combined acreage of the twenty lots – were being advertised for sale along with the right to use the same boat ramp and parking area, they filed this action against their predecessor in interest.[1] After a trial on the merits, the court held that only the purchasers of lots in "Phase One" were entitled to use the boat ramp and parking area. The defendants appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Thomas J. Tabor, Jr., Tazewell, Tennessee, for the appellants, Daniel J. Tribell, and wife, Ruby Tribell, as Trustees of the Daniel J. Tribell and Ruby Tribell Living Trust.

Terry M. Basista, Jacksboro, Tennessee, for the appellees, Anthony Ray Adkins and wife, Raye Ann Adkins; Ronald D. Casey; John C. Coward and wife, Sandra Coward; John Delaura and wife, Michelle Delaura; Brain P. Goins and wife, Nichole Goins; David D. Gough; Mayford McCarter and wife, Helen McCarter; Michael J. McWhorter; David E. Miller and wife, Kathryn D. Miller; Teresa D. Poston; and, Kenneth Powell and wife, Carolyn Powell.

---

[1]As we will later explain more fully, Bluegrass Estates, Inc. bought the predecessor's remaining land with plans to develop it, but eventually conveyed it back to the predecessor. Bluegrass was only a nominal defendant at trial and is not a party to this appeal.

# OPINION

## I.

### A.

On or about July 9, 2003, Daniel J. Tribell and Ruby Tribell, Trustees of the Daniel J. Tribell and Ruby Tribell Living Trust (referred to herein collectively as "Tribell")[2], recorded in the office of the Claiborne County Register of Deeds a document styled "Protective and Restrictive Covenants of Timberlake Estates Phase One" ("the Declaration"). Daniel Tribell, who is an attorney licensed in Kentucky, drafted the instrument. The terms pertinent to this dispute are

> WHEREAS, the undersigned, Daniel J. Tribell and Ruby Tribell, Trustees of the Daniel J. Tribell and Ruby Tribell Living Trust, are the owners of *the following described subdivision known as Timberlake Estates, Phase One*, which has been subdivided and recorded, and which proposes to restrict by this instrument, and
>
> WHEREAS, *said subdivision is known as Timberlake Estates, Phase One*, on Jones Ridge Road, Speedwell, Claiborne County, Tennessee, and *a map or plat of said subdivision is of record* in the Register of Deeds Office, Claiborne County, Tennessee, in Plat Book 3, at Page 346, and,
>
> WHEREAS, it is now desired and the intention and purposes *for the benefit and protection of the present owners or future purchasers of a lot or lots in this subdivision*, and to establish a sound value for *these lots*, and to record these restrictions so that they may be binding and enforceable and of public record.
>
> NOW THEREFORE, in consideration of the premises and the conditions and purposes herein set out, the undersigned, Daniel J. Tribell and Ruby Tribell, Trustees of the Daniel J. Tribell and Ruby Tribell Living Trust, bind themselves, their heirs,

---

[2]Since Daniel Tribell was the person who drafted the documents at issue, interacted with the purchasers and was a witness a trial, we will occasionally, where the context demands, make use of the singular masculine pronoun.

executors, administrators, successors and assigns, to impose the following covenants that will run with the land and/or lots in the subdivision referred to herein. These protective and restrictive covenants are as follows:

\* \* \*

4. All homes constructed on any of the 20 lots making up this subdivided property shall have a minimum of 1,000 square feet . . . .

\* \* \*

14. Use of the boat launching area and adjacent parking area shall be on a "first come, first served" basis, and while the easement and launching areas are not meant for public use, *property owners should be aware that this launching and parking area may be used by the present owners and owners of lots and property obtained from these developers*.

(Capitalization in original; emphasis added.) The referenced plat was recorded July 31, 2002. It reflects a total of 20 lots.

On July 12, 2003, Tribell held a public auction of all lots in the subdivision. It was advertised with brochures. The brochures state prominently on their front, among other things, "Absolute Auction Norris Lake, 20 Fabulous Tracts – 13 On the Water. .... TIMBERLAKE ESTATES." (Capitalization in original.) The back of the brochure repeats some of the language on the front and adds:

Boat Ramp: Private parking and boat ramp for owners of Timberlake Estates – reasonable restrictions for your protection.

An audio recording was made of the announcement of the "terms and conditions" on the day of the auction. It is clear from the recording that a large plat of the subdivision was displayed for all potential buyers to see. It is also clear that a copy of the Declaration was provided to all potential buyers. An announcement was made that 19 lots would be offered for sale and that all deeds would be subject to the Declaration. Potential purchasers were told that, as illustrated on the plat, there would be "private parking" in the vicinity of lots 6 and 7 for the "quiet enjoyment" of the "owners of Timberlake Estates." They were further told that lot 6 had been removed from the sale with the decision that it would "never" be sold

because the developer had decided that more room was need for parking than the .221 acres reflected on the plat because the original parking area was "not enough land for these people down there." It was announced that the developer would bear the expense of providing roads, electricity, and the proposed boat ramp reflected on the plat. Purchasers were assured that Tribell would secure a permit and construct the boat ramp when conditions allowed.

Only approximately half of the 20 lots were sold. Tribell managed to sell a few more lots by private sale. All deeds from Tribell to purchasers contained a provision stating that the "lot is sold SUBJECT to the [Declaration] filed with Plat and in Book 1126, Page 452-454, Register of Deeds Office, Tazewell, Claiborne County, Tennessee." (Capitalization in original.) Tribell drafted the deeds.

Tribell then sold the unsold remainder of the 20 lots contained in "Phase One" plus significant other acreage to Bluegrass Estates, Inc. Bluegrass assumed the obligation of developing the property including the obligation of building the boat ramp and parking area. Tribell financed the purchase by Bluegrass and took a mortgage as security. Trouble surfaced when Bluegrass advertised a second auction scheduled for June 16, 2007, of "250 acres" of "Wooded Estate Size Tracts" with a "[p]rivate boat launch and common area for all tract buyers." Interestingly, a map was included in the sales brochure that showed the development to be adjacent to "Timber Lake Estates" *rather than being a part of it.* Also, the brochure advertised that the estate-size tracts ranging in size from 9 to 21 acres could be subdivided "after 5 years." The "Phase One" lots could not be subdivided.

The majority of those individuals who had purchased "Phase 1" lots joined as plaintiffs ("the Plaintiffs") in an action filed on or about June 15, 2007, against Bluegrass and Tribell. That same day the Plaintiffs and Bluegrass reached an agreement settling all claims between them. The first complaint was dismissed without prejudice and the sale went forward. It was not successful. Bluegrass defaulted on its obligations under the settlement agreement as well as its obligations under the purchase agreement with Tribell. Tribell foreclosed and took all unsold property back from Bluegrass. The Plaintiffs re-filed this present action. The boat ramp and parking area has not been built.

B.

After hearing the proof we have outlined, the court announced the following as its decision:

> There's no need in going any further in the lawsuit. . . . There's
> not a great factual dispute in this matter. . . . As far as I'm
> concerned, this lawsuit is a business transaction. . . . Gentlemen,

-4-

I consider this matter a much more simple matter after reviewing all of the evidence from these lawyers. I'm looking here at three or four documents . . . . I'm going to use somebody of common average intelligence and sense in business experience that comes upon an advertised transaction. And handed to him is a document . . . [that] says, "Norris Lake, Absolute Auction, Saturday, twenty fabulous tracts, thirteen on the water, Timberlake Estates, year-round water on Norris Lake with 850-mile shoreline. Lots 15 and 16 will sell at Absolute Auction, all other with reservation." It has a map of this property. On the back of this document it says, "Absolute Auction," which has legal meanings that we all lawyers understand, "on Saturday, July 12th at 11:00 a.m. The Timberlake Estates will sell twenty fabulous tracts, thirteen on the water." And it gives an auctioneer's note, "Excellent finances, the location, year-round water on Norris Lake with 850 miles shoreline." And it says, "Boat ramp, private parking and boat ramp for owners of Timberlake Estates. Reasonable restrictions for your protection." Now, Timberlake Estates is described here as twenty fabulous tracts. We have another brochure, "Absolute Auction." The same general description, prettier color. These are nice lots. There is a map of the entire area, and on the back its says, "Absolute Auction, Norris Lake, twenty family tracts, thirteen on the water. Boat ramp, private parking and boat ramp for owners of Timberlake Estates. Reasonable restrictions for your protection." . . . . If you buy a lot, private parking, private boat ramp, reasonable restrictions. And then coming with the deed is a document, described as Exhibit 1, that reads like this: "The use of the launching area and adjacent parking area shall be on a first-come first-served basis." Well, that's certainly reasonable between the sale of twenty lots here. That's the way it would have to be. "And while the easement and launching areas are not meant for public use, property owners should be aware that this launching and parking area may be used by the present owners, as all the lot owners, and owners of lots and property obtained from these developers." In the auction all twenty lots did not sell. Some of the lots of the plaintiffs here today were acquired subsequent to this, so that's what that can mean very easily, and I think in commonsense terms that's what it does mean. Under no  circumstances can this court construe

the documentation of this sale to mean that we're going to set aside Lot 6 for our twenty Timberlake members and two hundred and fifty others who are going to come along. Had that been announced, that's the same as not having any access. It would be the same as having public access. It would be practically no access. I think it would depreciate the value of the lots by half, and I think the plaintiffs are reasonably entitled to believe that their launching area was only for their twenty tracts of land. And the court so holds that that's the law in this case and that these lots shall be held in perpetuity for the use and benefit of these twenty sold – or unsold tracts. If there's any tracts unsold, they can be used by those owners but by nobody else. . . . .

\* \* \*

I've not found any intentional misconduct on Mr. Tribell's part. I don't think he intentionally tried to mislead these people. I think they were just misled by the way it was done. . . . .

The court entered judgment awarding the Plaintiffs zero damages but holding that,

The present and future owners of lots [numbering twenty (20)] in the subdivision known as "Timberlake Estates, Phase One" are and shall henceforth be entitled to the unencumbered and private use of the present easement, parking area (including Lot 6), and boat ramp/launching area as a right which runs with the land in perpetuity appurtenant to each of the said Twenty (20) lots in said subdivision, to the exclusion of all others who are not owners of one or more of the lots in the said Timberlake Estates, Phase One Subdivision which is the subject of this civil action. It is further specifically found and determined that no parcel, tract, or lot from any of the adjoining acreage outside of the confines of the Timberlake Estates, Phase One Subdivision shall have any appurtenant right of use of the present easement . . . .

II.

Tribell filed a timely notice of appeal. He raises the following issues:

-6-

Whether the court erred in interpreting the covenant.

Whether the court erred in implying new terms in the covenant.

Whether the court erred in adjudicating property rights of nonparties without jurisdiction.

Whether the court erred by failing to find facts or to state separately its conclusions or law.

## III.

The factual findings of a trial court sitting without a jury are reviewed *de novo* with a presumption of correctness and will not be reversed on appeal unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); **In re Angela E.**, 303 S.W.3d 240, 246 (Tenn. 2010). Interpretation of written documents is generally a matter of law for the court that is reviewed *de novo* with no presumption of correctness. **Allstate v. Watson**, 195 S.W.3d 609, 611 (Tenn. 2006); **Nelson v. Wal-Mart Stores**, 8 S.W.3d 625, 628 (Tenn. 1999). However, it can become an issue for the trier of fact if the document is ambiguous and parole evidence is needed to determine the meaning of the document. **Planters Gin v. Federal Compress**, 78 S.W.3d 885, 890 (Tenn. 2002).

## IV.

Tribell argues that the Declaration is "unambiguous and contains no express or implied limit to prevent [him] from granting further easements to owners beyond Phase 1." Although he does not connect all the dots, he clearly wants to lead us to the conclusions that the court should have confined its analysis to the four corners of the Declaration, and that the language of the Declaration clearly gives him the right to grant use of the boat ramp and parking area to purchasers of property outside Phase One. Interestingly, Tribell offered his own parole evidence about the meaning of the Declaration, and he does not argue that the court erred in admitting the parole evidence. He argues that "[t]here was simply no evidence presented that [he] ever intended to make the private use of his own boat ramp exclusive to buyers in only one part of Timberlake estates." Finally, Tribell contends that the court found the Declaration to be unambiguous but nevertheless erroneously found the meaning of the Declaration outside of its four corners.

We must begin with the rules applicable to construction of written documents such as deeds.

. . ."The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Allstate Ins. Co.*, 195 S.W.3d at 611; *Staubach Retail Services-Southeast LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 526 (Tenn. 2005); . . . *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

All provisions of the contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions. *Teter v. Republic Parking Systems, Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005). . . . The interpretation of an agreement is not dependent on any single provision, but upon the entire body of the contract and the legal effect of it as a whole. *Aetna Cas. & Surety Co. v. Woods*, 565 S.W.2d 861, 864 (Tenn. 1978). The entire contract must be considered in determining the meaning of any or all of its parts. *Id*.

In construing the contract, the trial court is to determine whether the language is ambiguous. *Allstate Ins. Co.*, 195 S.W.3d at 611; *Planters Gin Co.*, 78 S.W.3d at 890. If the language in the contract is clear and unambiguous, then the "literal meaning controls the outcome of the dispute." *Allstate Ins. Co.*, 195 S.W.3d at 611; *City of Cookeville, Tn. v. Cookeville Regional Med. Ctr.*, 126 S.W.3d 897, 903 (Tenn. 2004); *Planters Gin Co.*, 78 S.W.3d at 890. "A contract term is not ambiguous merely because the parties to the contract may interpret the term in different ways." *Staubach*, 160 S.W.3d at 526.

If, however, the language in a contract is susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the contract. *Allstate Ins. Co.*, 195 S.W.3d at 611 (*citing Planters Gin Co.*, 78 S.W.3d at 889-90). Contract language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more

ways than one." ***Allstate Ins. Co.***, 195 S.W.3d at 611 (*quoting*
***Farmers-Peoples Bank v. Clemmer***, 519 S.W.2d 801, 805
(Tenn.1975)).

If contractual language is found to be ambiguous, then a court
must apply established rules of construction to ascertain the
parties' intent. ***Allstate Ins. Co.***, 195 S.W.3d at 611-12 ( *citing*
***Planters Gin Co.***, 78 S.W.3d at 890). "Only if ambiguity
remains after the court applies the pertinent rules of construction
does [the legal meaning of the contract] become a question of
fact" appropriate for a jury. ***Planters Gin Co.***, 78 S.W.3d at
890. In that case, a factfinder may use extrinsic or parol
evidence, such as the parties' course of conduct and statements,
to guide the court in construing the contract. ***Allstate Ins. Co.***,
195 S.W.3d at 612. If the contract is unambiguous, then the
court should not go beyond its four corners to ascertain the
parties' intention. ***Rogers v. First Tennessee Bank National
Ass'n***, 738 S.W.2d 635, 637 (Tenn. Ct. App. 1987).

***Shuttleworth, Williams, Harper, Waring & Derrick, PLLC v. Smith***, No. W2007-00295-
COA-R3-CV, 2010 WL 744375, at *2 -3 (Tenn. Ct. App. W.S., filed March 5, 2010).

To aid the court's discernment of the parties' intention,
however, the parol evidence rule does not prohibit the court
from considering the circumstances surrounding the formation
of the contract, the business to which the contract relates, and
the construction placed upon the contract by the parties in
carrying it out. ***Simonton v. Huff***, 60 S.W.3d 820, 825 (Tenn.
Ct. App. 2000); ***Frank Rudy Heirs Assocs. v. Sholodge, Inc.***,
967 S.W.2d 810, 814 (Tenn. Ct. App. 1997); . . . ***Coble Sys.,
Inc. v. Gifford***, 627 S.W.2d 359, 362 (Tenn. Ct. App. 1981).
Moreover, any "[a]mbiguous language in a contract is construed
against the drafter." ***Jackson v. Miller***, 776 S.W.2d 115, 117
(Tenn. Ct. App. 1989).

***Healthmart USA, LLC v. Directory Assistants, Inc.***, No. M2010-00880-COA-R3-CV, 2011
WL 1314662, at *2 (Tenn. Ct. App. M.S., filed April 6, 2011).

A word or expression in the contract may, standing alone, be
capable of two meanings and yet the contract may be

unambiguous. Thus, in determining whether or not there is such an ambiguity as calls for interpretation, the whole instrument must be considered, and not an isolated part, such as a single sentence or paragraph. The language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.

*Fisher v. Revell*, ___ S.W.3d ___, 2009 WL 3103796 (Tenn. Ct. App. W.S., filed Sept 30, 2009)(appeal denied March 15, 2010)(*quoting* 77 C.J.S. Contracts § 304)

Upon consideration of the above principles, we conclude that the Declaration is ambiguous. It identifies only one subdivision – a "subdivision known as Timberlake Estates, Phase One." The subdivision is expressly limited by the language of the document to "Timberlake Estates, Phase One" as reflected on a plat that shows exactly 20 lots, which plat recites that it is a map of "TIMBERLAKE ESTATES, PHASE I LOTS 1 [THRU] 20." (Capitalization in original.) A reasonable reader of the document could conclude that although there might be additional "phases" to come, those phases will be part of another subdivision.

Tribell attempts to make much of the idea that the term "Phase One" implies that other phases will follow. This is his primary argument that the Declaration is unambiguous and he must win. In this regard, his counsel cross-examined several of the Plaintiffs strenuously with a dictionary definition of the term "phase." However, as we have indicated, we believe the inclusion of the words "Phase One" as part of the nomenclature of the only subdivision identified in the Declaration and the plat suggests to a reasonable reader that this subdivision is limited to the 20 lots laid out on the plat. To illustrate our point, it will be helpful to imagine the Declaration and the plat had omitted the words "Phase One." Thus, the Plaintiffs would have bought lots in a "subdivision known as Timberlake Estates," further identified in the plat as "TIMBERLAKE ESTATES . . . LOTS 1 [THRU] 20." (Capitalization in original.) The buyer of a lot in our imaginary scenario may well have been on notice that more lots *would be added* to the subdivision. The natural and ordinary meaning of the nomenclature of the actual subdivision, however, implies that it is limited to 20 lots.

Of course, we cannot stop with the language that names and identifies the subdivision. We must examine the entire document. The document goes on to state the "intention and purposes" behind the Declaration to be "the benefit and protection of the present owners or future purchases of a lot or lots in *this subdivision*." (Emphasis added). This phrasing ties directly into the name and identification of the subdivision as "Timberlake Estates, Phase

-10-

One." A reasonable purchaser of a lot in "Timberlake Estates, Phase One" could read all the language we have discussed thus far as suggesting that the Declaration is for their benefit alone.

Tribell argues that the Plaintiffs were on notice that their rights were not exclusive from the following language in paragraph 14 of the Declaration: "property owners should be aware that this launching and parking area may be used by the present owners and owners of lots and property obtained from these developers." We agree with the Plaintiffs, however, that at best the language is ambiguous. Tribell was identified as the owner in the Declaration which was recorded before the auction. Thus, on the day of the auction he was the "present owner." He was identified on the plat as the owner. Potential purchasers on the day of the auction were therefore on notice that Tribell, and some subset of purchasers from Tribell, would have the right to use the boat ramp. The term "developer" was not defined in any manner within the Declaration. It was imminently reasonable for a potential purchaser of one of the 20, actually 19, lots to read the word "developer" to mean the "developer" of the only subdivision identified anywhere in the Declaration, i.e., the "subdivision known as Timberlake Estates, Phase One" consisting of 20 lots. The trial court built upon this thought with consideration of the circumstance that some lots in "Timberlake Estates, Phase One" were sold after the auction. Thus, for the post-auction purchases, "present owners" included the purchasers at the auction, and the new purchasers became "owners of lots and property obtained from these developers." This was determined by the trial court to be a reasonable interpretation, and the most sensible, interpretation of the Declaration.

We do not agree with Tribell that the trial court found the Declaration to be unambiguous. We have scoured the memorandum opinion and the judgment and do not see that express finding. Even if the court had, however, found the language to be unambiguous, there was no error in looking to the circumstances under which the lots were sold. *Health Mart USA*, 2011 WL 1314662 at *2. The circumstances that the court found persuasive include the advertisement that brought the bidders to an "absolute auction." As the trial court correctly observed, the ordinary meaning of such terminology is that the high bidder takes whatever is put on the auction block, with nothing held back by the seller. Bidders and purchasers were told that all "20 fabulous tracts," which was the number of lots identified in the Declaration and the plat as the full measure of the subdivision, would be up for sale. They were explicitly told that Tribell would build a boat ramp and parking area at his expense. They were told both orally and in writing that there was "[p]rivate parking" for the owners of Timberlake Estates. It is true that the flyer does not employ the words "Phase One," which we have read as limiting the scope of the subdivision. However, in addition to the brochure, the purchasers were given a copy of the Declaration, which limited the definition of the subdivision to 20 lots. We agree with the trial court that a reasonable

-11-

purchaser would think that "Timberlake Estates" as referenced in the brochure was the twenty-lot subdivision described in the Declaration and the plat.

After hearing the proof, and considering the circumstances of the sale, including the terminology of the Declaration, the trial court concluded that "the [P]laintiffs are reasonably entitled to believe that their launching area was only for their twenty tracts of land." One of the circumstances that work in the Plaintiffs' favor that we have not yet mentioned, is that the Declaration was drafted by Tribell. *See Jackson v. Miller*, 776 S.W.2d at 117. We conclude that the case was, indeed, in a posture for the trial court to make a finding of fact as to the meaning of the Declaration. We further conclude, and so hold for the reasons we have stated above, that the evidence does not preponderate against the court's findings.

Tribell argues that the court's interpretation must be in error because it contravenes the law of easements. Tribell argues that the boat ramp and parking area were not conveyed from Tribell to the Plaintiffs and that at most they took an easement to use the facilities through the language of the Declaration. The argument continues that since the Plaintiffs took only an easement, Tribell retained ownership of the facilities at issue, including the right to grant additional easements. He also argues that the law will not presume that one easement is exclusive of the right to grant additional "non-interfering easements." We note that, for the most part, Tribell relies on a treatise rather than Tennessee cases. We need not decide today whether the treatise correctly states the law of this State because Tribell cannot get past the qualifier "non-interfering." The proof in this case is that the second auction was for 250 acres of land that could be further subdivided after a relatively short waiting period. The lots in "Phase One" range in size from approximately one-half acre to one acre. Tribell criticizes the trial court for stating that eventually the "private" facility, if opened to all potential purchasers from Tribell, would be subject to use by "two hundred and fifty others who are going to come along." We believe that the court simply made a permissible inference based on the facts before it. The court specifically found that unless limitations were placed on the easement, the Plaintiffs' "private" facilities would be devolve into "practically no access," or little more than "having public access." Again we conclude that the evidence does not preponderate against the court's findings.

Tribell next argues that the trial court erred in not requiring the Plaintiffs to join as necessary parties all the owners of lots outside Phase One. *See* Tenn. R. Civ. P. 19.01 (" A person who is subject to service of process shall be joined as a party if . . . the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect that interest . . ."). Tribell argues that their rights were necessarily affected by the court's judgment because their deeds also are subject to the Declaration. The Plaintiffs point out that neither in a pleading nor at the trial on the merits did Tribell ever

raise the issue of missing necessary parties. Even if the issue is pleaded, it must be brought to the attention of the trial court no later than at the trial on the merits so that the trial court can make a determination as to whether the purported necessary party is truly needed in the case. *Griswold v. Income Properties, II*, 880 S.W.2d 672, 678 (Tenn. Ct. App. 1993). The issue cannot be held as the proverbial "ace in the hole" to be played on appeal. *Id*. Tribell's failure to call the issue to the attention of the trial court constitutes a waiver of the issue. *Id*.

Tribell's final argument is that "the Opinion and Order both failed to set out the court's findings of fact and conclusions of law." Although he recites the controlling language in Tenn. R. Civ. P. 52.01[3], he fails completely to explain how the memorandum opinion is deficient. If a party does not adequately brief an issue on appeal, the issue is waived. *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Although we could treat the issue as waived for lack of adequate briefing, we briefly address it. Our discussion of the court's findings above show that "his findings as a whole cover all relevant facts necessary to a determination of the case." *Hodge v. Provident Life And Acc. Ins. Co.*, 664 S.W.2d 297, 300 (Tenn. Ct. App. 1983). Thus, the court's opinion satisfies the purpose of the rule. *Id*. Further, even the refusal to make requested findings is not reversible error where, as here, the record furnishes the party challenging the judgment with all the information needed to challenge the judgment. *Bruce v. Bruce*, 801 S.W.2d 102, 105 (Tenn. Ct. App. 1990); *see* Tenn. R. App. P. 36(b).

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, Daniel J. Tribell, and wife, Ruby Tribell, as Trustees of the Daniel J. Tribell and Ruby Tribell Living Trust. This case is remanded, pursuant to applicable law, for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[3] The pertinent language in Tenn. R. Civ. P. 52.01 is as follows:

> In all actions tried upon the facts without a jury, the court shall find the facts specifically and shall state separately its conclusions of law and direct the entry of an appropriate judgment. . . . If an opinion or memorandum decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. . . .